**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| RICARDO HARO<br><br>Plaintiff,<br><br>v.<br><br>RODNEY BRYANT,<br><br>Defendant. | CIVIL ACTION FILE NO.<br>1:25-CV-00257-JPB<br><br>**JURY TRIAL DEMANDED** |

# BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW DEFENDANT, and files and serves this Brief in Support of his Motion for Summary Judgment, showing the Court as follows:

## I. FACTS WITH BRIEF INTRODUCTION

### A. Brief Introduction

This is a defamation case involving a private plaintiff suing a public figure speaking on matters of public concern and asserting statutory conditional privileges. Georgia law favors pretrial, dispositive resolution of defamation cases of this ilk, and this case should be no different. The high burden placed upon Haro to show by clear and convincing evidence at the summary judgment phase that Chief Bryant subjectively acted with Constitutionally and statutorily-prohibited actual malice in order to harm him is not met here, and summary judgment in order.

Actual malice standards permeate throughout the case. For example, there is the actual malice required to defeat a public official's discretionary act defense of "official immunity" (actual intent to cause the harm required; reckless disregard not enough). Then there is *New York Times v. Sullivan* actual malice (actual malice satisfied by knowledge of falsity or reckless disregard for truth). 84 S. Ct. 710 (1964). There is even a statutory malice standard that comes into play because of the assertion of a conditional privilege. (O.C.G.A. § 51-5-9 (liability may be had "where the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted.").

Applicable to all these standards is the clear direction that the focus of the inquiry here must be laser-focused in on the subjective actions and subjective state of mind of Chief Bryant. The reasonable man and other objectivity inquiries are not in play.

**B. Facts**

**1. History Leading to the Speech at Issue**

The case centers on an FBI authorized and authored press release and an FBI called-for press conference (at times "presser"). (Ex "A" – FBI Press Release; Ex B – link to presser https://www.youtube.com/watch?v=rUVZN_qEuAU). The release and presser were ostensibly had in order to present the short-term results of a federal/state multi agency crime fighting partnership known as Operation

Phoenix. Along with the others, the FBI's release labelled Haro as one of "twelve of Atlanta's most violent offenders," who were "deemed the most dangerous to the citizens of this city." Id. Bryant knew nothing of the release. Had not seen a copy of it before speaking at the presser. Knew nothing of Haro at any time until served with ante litem notice of Plaintiff's legal intentions. (Ex C – Bryant Affidavit).

Haro says the information about him was false and misleading because he was not a hardened criminal/a repeat offender/a gang member/or one of the 12 most dangerous criminals in Atlanta as indicated in the press release. Before addressing this contention head-on, Bryant first presents a clear understanding of the history leading up to the proffered speech in question

Haro was arrested on June 4, 2020 for a curfew violation and misdemeanor simple battery for having spit blood on an FBI Agent at the height of COVID and while the City was operating under a state of emergency. (Doc. 1, p. 7 ¶ 18). Haro had no notable criminal record at the time. Hold that thought for a minute.

Rodney Bryant was enjoying retirement on that very date, only to be pulled out of it on June 12, 2020 to serve as Interim (and later, actual) Chief of the Atlanta Police Department…on the very day Rayshard Brooks was shot in Downtown Atlanta and the prior Chief resigned. Bryant inherited a city on fire. (*See generally*, Bryant Aff., ¶¶ 3-4).

COVID had all but shut down the inner workings of the City and just when things were opening back up, the George Floyd protests had turned violent, Rayshard Brooks protesters had burned down the Wendy's, Secoriea Turner was shot, and the processing of criminal matters through the state court system had screeched to a halt. This was followed by the well-known and documented opening of a COVID-sealed City strife with the social unrest of 2020 then going hand-in-hand with a well-publicized notable spike in crime. And it was getting worse. (*See generally*, Bryant Aff, ¶ 3; Ex. "B", Press Conference, 9:20 – 10:50).

It was during this spike in crime, at some point that summer, an APD intelligence unit presented to Chief Bryant and his Command Staff a network of individuals that they believed were truly committed to continuing violence and were having a significant impact on the crime being seen inside the City. (Bryant Aff, ¶ 4; Ex. B, Press Conference, 9:20 – 10:50). Impressed, Bryant bought in, and given the findings of this intelligence unit, reached out to the federal government for federal law enforcement assistance. (Bryant Aff, ¶¶ 4-5).

Two things on this. One, is that during the later press conference at issue (at times, the "presser") Chief Bryant was speaking specifically and directly about how the above information on a criminal network came to him and how it led him to seek federal assistance. (Bryant Aff, ¶ 14). Haro misinterprets that speech by attempting

to fashion a narrative that Bryant was discussing the List of 12 from Operation Phoenix, which he was not (more on this later).

Second, the Feds said yes, and in doing so sent in the cavalry - leadership, direction, and a game plan for what came to be known as Operation Phoenix. Operation Phoenix was a multi-agency operation formed to identify, investigate, and prosecute violent individuals that could be charged with *federal crimes, and be prosecuted through the federal justice system*. Participating organizations included the FBI, Safe Streets Gang Task Force, Atlanta Police Department ("APD"), United States Attorney's Office Northern District of Georgia ("US Attorney"), Georgia Bureau of Investigations, Homeland Security Investigations, ATF, DEA, and the U.S. Secret Service. (Bryant Aff, ¶ 6). That's 7 federal agencies, APD and the GBI.

Again, the plan was to bring in those that could be charged with federal crimes and prosecuted through the federal justice system, specifically because Georgia's system was effectively shut down; and because of COVID, bonds were more easily obtainable as the jails didn't want anyone coming in from the outside. As a result, a larger percentage than usual of those for whom probable cause existed for arrest and detention were getting out on bond. Hence playing its part in the overall spectrum of crime. (Ex. B, 19:53-20:12).

As the end game was federal prosecution for federal crimes, the FBI and US Attorney set the criteria for those individuals that would be prosecuted. On the ground, the operation was broken down into eight (8) teams made up of representatives from the various agencies. These teams would process information on criminals and suspected criminals (both those on APDs original list and hundreds upon hundreds, if not thousands of others) and would forward information on to the FBI and USAO for prosecutorial decision-making. (Bryant Aff, ¶ 7). Information on Ricardo Haro was passed up the chain from Team 4 “which consisted of two FBI special agents, an FBI task force officer, a Secret Service agent, and an APD officer.” (This Court’s Order in *Haro I,* Case 1:21-cv-04478JPB, Doc. 78, p. 4).

APD Officer Dan Worrell was on Team 4. Officer Worrell has no recollection whatsoever of how Ricardo Haro’s name was discovered or processed. *What is clear is that the FBI was the sponsoring agency seeking to have the USAO prosecute Plaintiff with some federal crime*. (Bryant Aff, ¶ 7; Exhibit “D” - Worrell Affidavit, ¶¶ 3-4).

As for Defendant Bryant’s participation in Operation Phoenix, that was limited to periodic conference calls and he made no recommendations of individuals for inclusion in the operation. (Bryant Aff, ¶ 10). In so participating, on three occasions in September 2020, the FBI directly provided Bryant three PowerPoint presentations that the parties refer to as “baseball cards.” The baseball cards were

the subject of several meetings between the FBI and APD, and Bryant likely reviewed the baseball cards when he received them. (*Haro I*, Case 1:21-cv-04478-JPB, Doc. 78 pp. 4-5).

The baseball cards provided the gang affiliations and criminal history of eighteen (18) specific targets of Operation Phoenix, including Haro. Haro's baseball card states that he was arrested on June 4, 2020, by APD for simple battery towards a police officer. Haro's baseball card further states the following: . . . Haro was being processed for transport to the city jail in violation of the 9:00 pm curfew on 4 June 2020, when he spat blood on the right arm of FBI SA Thomas McAfee. Following the incident, Haro also stated that he had a machete in his car and threatened to kill people with it. Haro's baseball card also stated that database queries produced zero results for Haro other than the Assault on a Federal Officer investigation. Id., p. 5.

Although he likely reviewed the baseball cards, Haro's appearance therein did not catch Chief Bryant's eye, who had no idea who Ricardo Haro was until he was served with ante-litem notice threatening the City with potential suit. Bryant has no independent recollection of reviewing information specific to Haro. According to Bryant, it would have been of no moment to him had he noted the disparity in levels of criminality, etc. inasmuch as he would have thought the FBI and US Attorney would have good reason to be considering federally prosecuting Haro for his name to be on the list. (Bryant Aff, ¶¶ 8, 10).

> I do not know why Ricardo Haro was being processed by the federal government in connection with Operation Phoenix, and it was of no moment to me as to why he was being prosecuted. The FBI and USAO set the criteria for selection and prosecution of those coming through Operation Phoenix, and if/had I thought about it at the time, I would have assumed the federal government had good reason to be considering prosecuting Mr. Haro.

(Bryant Aff, 8).

**2. The Speech at Issue**

**a. The Press Release**

On the same day as the press conference, October 29, 2020, and on FBI letterhead the FBI issued a press release, which stated:

> Atlanta – FBI Special Agent in Charge Chris Hacker, Interim Atlanta Police Chief Rodney Bryant and U.S. Attorney Byung J. "BJay" Pak announce that twelve of Atlanta's most violent offenders are being charged as a result of Operation Phoenix, a sustained and coordinated law enforcement initiative to fight violent crime in the City of Atlanta. Operation Phoenix began on August 18, 2020 in an effort to identify, investigate and prosecute those individuals deemed the most dangerous to the citizens of this city. Federal law enforcement agencies worked in conjunction with local and state law enforcement officials to identify offenders. [Doc. 57-5, p. 2].

(Exhibit "A"). The press release listed twelve individuals, one of which was Haro: "Ricardo Haro, 19, Simple Battery against a Police Officer (state charge)." Id.

Chief Bryant knew nothing about the actual content of the press release prior to its release. He did not author it, knew nothing of its content, provided no input into it, and did not review it prior to its release (Bryant Affidavit; Bryant depo pp.

15-16) As this Court has already held, the FBI issued the release. (*Haro I*, Case 1:21-cv-04478-JPB, Doc. 78, p. 7).

This said, Bryant was contacted by FBI AIC Hacker about the press release before it was released. Bryant did not review the content of the press release at that time. FBI AIC Hacker "asked if I could join, and I said I would." (Bryant Depo., p. 73, lines 12-18).

Bryant specifically recalls understanding the press release/press conference was not going to include names, just numbers. Meaning, he understood that no names of individual criminals would be discussed in the press release or at the presser, but that the number of criminals taken off the street would be included. (Bryant Depo., p. 73, lines 19-25 through p. 74, lines 1-2).

Further, the FBI posted the press release on its website. (Ex A) Neither Bryant nor the City of Atlanta ever placed the release or any reference to it on a City website. (Spikes Affidavit, pp. 1-2, ¶¶ 2-3).

**b. Leading Up to the Press Conference**

Attachment "1" to the Bryant Affidavit shows the makeup of the 8 Operation Phoenix teams processing information on to the FBI and US Attorney for prosecutorial decision-making. Attachment "2" indicates in the "Source" column, the sponsoring agency of each of the names on the list. Per that list, the FBI was the source/sponsoring agency processing Ricardo Haro's name through the operation.

This same Attachment also indicates that the US Attorney was still considering federally prosecuting Mr. Haro as late as September 22, 2020. (Bryant Affidavit, Para. 7).

As mentioned near the outset, the critical legal focus here is on Bryant's subjective actions and subjective state of mind with respect to what he said at the press conference. Understanding this, the only evidence in this case concerning these matters comes from Bryant's own undisputed testimony. And Bryant's undisputed testimony leads to the inevitable conclusion that Haro will be unable as a matter of law to show he (Bryant) was acting with actual malice, or malice of any kind for that matter.

With this is mind, going into the press conference, Chief Bryant had a clear understanding of what role he was being asked to play. His clear understanding was that he was to advise the public of why and how it was that Operation Phoenix came into existence. The *How Did We Get Here?* portion of the presentation as Bryant put it. And again, it was his understanding from speaking with FBI's AIC Hacker that names were not going to be released in the FBI press release or at the Press Conference. His understanding was that the only information being released were "the number" – the number of arrests and prosecutions, not names. (Bryant Depo., p. 73, lines 19-25 through p. 74, lines 1-2).

**c. The Press Conference**

The Parties respective understanding of the case takes a divergent turn when it comes to the effects of Rodney Bryant's speech at the Press Conference. The issue being, that Haro believes Chief Bryant was referring to Operation Phoenix, and specifically to the *List of 12 – the list of the 12 most dangerous criminals in Atlanta* (as indicated in the press release) throughout the speech, whereas Bryant was subjectively describing the state of the City during the Summer of Covid, and all the factors leading up to his determination to reach out to the federal government for federal assistance with the City's horrific crime problem. (Bryant Aff., p.8, ¶ 14).

True to his understanding, true to his testimony and true to his speech, Bryant *was not speaking about the "List of 12."* No, he was speaking specifically to the genesis of Operation Phoenix. There he identified where the City had found itself during the Summer of Covid/the Summer of the Crime Spike. He spoke to the 20reasons for the crime spike. Every time he referenced a network of criminal individuals he was specifically speaking about the network identified by an APD investigative team. He was not speaking about the list set out in the FBI's Press Release. (Id.; Bryant Depo. p. 36, lines 2-20).

Plaintiff's narrative is that when speaking to the criminal network, Bryant was speaking about the List of 12, and specifically, Ricardo Haro. Two things on that.

First, no, he wasn't. On the issue of Bryant's subjective actions and subjective state of mind, his deposition and affidavit testimony are unassailable. Especially given the high actual malice standards floating about this case.

Second, as attractive as Plaintiff's objective take on the speech may be, the standards to be imposed in the case are subjective ones, and so Plaintiff's case should be cut off at that particular (as well as other) paths.

There is no evidence Bryant knew the press release would be handed out at the Press Conference, nor whether it actually was. Defendant knows of no evidence that it actually was. There does not appear to be record evidence of just when the press release was issued, before or after the presser. Bryant was there to speak to a limited subject, the one regarding which he had the most knowledge – what it was about the status of crime in his City than led him to seek federal assistance. (Bryant Aff., p. 8, ¶ 14). Conversely, he was by no means the most knowledgeable about the inner workings of Operation Phoenix, as his role was to observe from the 30,000-foot mark. He had no knowledge why the FBI was sponsoring the prosecution of Ricard Haro, knew nothing of why the US Attorney was considering prosecution, and did not have his sights on Ricardo Haro, nor the individuals listed in the List of 12 in presenting his "How did we get here" speech. (Bryant Aff., p. 6, ¶¶10, 14). This is all based on the undisputed testimony of Chief Bryant, the only admissible

evidence pertaining to his subjective state of mind at the time he spoke at the Press Conference.

> The FBI called for the October 29, 2020 press conference. It was the FBI's press conference. It was hosted by the City merely as a matter of convenience.
>
> For the press conference, the FBI asked that I speak to the why's and how's of Operation Phoenix' genesis. And that's what I did. I spoke to the complexities of a crisis in the rise of violent crimes facing the City. I spoke to the systematic and psychological effects surrounding the COVID crisis, the effects of re-opening the City, the civil unrest of 2020, and the closing down of the state court system. I spoke specifically regarding an APD intelligence unit that showed me a network of individuals committed to continuing violence, significantly impacting the City's crime rate. As a result of all of the above, I reached out to the federal government for assistance.

(Bryant Aff., 13-14). This is subjectively what Chief Bryant was doing and did when speaking at the Press Conference. He told the story of the necessity for the creation of Operation Phoenix.

Again, it was the FBI that called for the October 29, 2020, press conference. It was the FBI's press conference, hosted by the City. It was hosted by the City merely as a matter of convenience. (Bryant Affidavit, ¶ 13) The lead speakers at the Presser were FBI Special Agent in Charge Chris Hacker, former United States Attorney BJay Pak, and Chief Bryant. Hacker began the presser by noting "Operation Phoenix is [ ] a sustained, systematic and coordinated law enforcement effort between federal, state, and local law enforcement to address the rising violent

crime here in the City." (FBI Special Agent in Charge Chris Hacker, speaking at press conference, Exhibit "A", 1:27-1:37). Hacker said that:

> In ten short weeks, *after we started* Operation Phoenix, we identified about a dozen individuals, who we believe to be some of the *most significant violent crime offenders* in the [C]ity. We jointly investigated those individuals and brought the results to Mr. Pak, whose office brought federal charges against many of these individuals.

(Doc. 1, ¶ 32b. (emphasis in original).

Note, Agent Hacker stated that it was 10 weeks after the genesis of Operation Phoenix that the identification of the List of Twelve was crafted. When speaking to a network of criminal individuals, Bryant was not speaking to the List of Twelve. He was speaking specifically to the network brought to him by an APD intelligence unit that was later utilized in Bryant's selling the need for federal assistance. By the time the List of 12 was chiseled out Operation Phoenix had processed "hundreds upon hundreds, if not thousands of names beyond the network of individuals originally crafted by the APD intelligence unit." (Bryant Affidavit, pp. 8-9, ¶¶ 14-15).

Notably, no names of criminals or suspected criminals were mentioned during the Press Conference. Nor is there any evidence that the press release was handed out during the conference, nor evidence that names were in any way physically illuminated for public consumption at the Press Conference. Certainly, Rodney Bryant made no mention of the Press Release when speaking.

Finally, the decision to participate in the press conference was Chief Bryant's. He did not have to do so as nothing in the law or his job description required him to do so. He had no duty to report on the advancement of Operation Pheonix. Same with the press release. Had Chief Bryant had anything to do with the press release, he would have done so pursuant to the discretion he had as the Chief of Police of a major metropolitan police department. (Bryant Affidavit, ¶ 11).

## II. ARGUMENT AND CITATION OF AUTHORITY

### A. Introduction

Every box is checked in showing summary judgment is in order. For summary judgment purposes, overall, Plaintiff will be unable to offer clear and convincing evidence that Chief Bryant in fact entertained serious doubts as to the truth of his statements or that he otherwise acted with *New York Times* actual malice.

With respect to the press release, Bryant has shown undisputed evidence that it was an FBI press release (as determined by this Court in Haro I) authored by an FBI agent with no input or need for approval from Bryant. An FBI press release that Bryant was led to believe would not mention names of criminal suspects, but only that numbers – the number of law enforcement successes would be discussed.

Were the Court to assume Bryant's actions somehow transform him into an author or publisher of the press release, still there would be no evidence (let alone clear and convincing evidence) that Chief Bryant' subjective *mens rea* reached the

level of actual malice required to impose liability. This also applies in full force to the press conference claims. At worst, the evidence may show negligence, may show a need to investigate (which it does not). But as the mountain of cited case law robustly indicates, such evidence is insufficient to show actual malice (again, let alone clear and convincing evidence thereof).

To the extent Haro's opposition brief may wax objectivity (though likely under the guise of purported subjectivity), that same mountain of case law stands in his way. Evidence of Bryant's subjective actions and subjective state of mind are the focus of the legal inquiry before the Court. And it is evidence of those very things that show summary judgment on all claims is appropriate.

### B. Official Immunity

Official immunity is addressed first here as it is a jurisdictional question. *See, e.g., McCloud v. Lowndes Cnty. Bd. of Commissioners*, 369 Ga. App. 756, 758 (2023) (in context of 12(b) resolution). The Georgia Supreme Court has defined a ministerial act as "commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." *Murphy v. Bajjani*, 282 Ga. 197, 199 (2007). A discretionary act, on the other hand, "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." Id.;

As just mentioned, the decision to participate in the press conference was Chief Bryant's. No rule, policy, law or anything of the like required Chief Bryant to participate in the creation or authorization of the issuance of the press release or his participation in the press conference. Under the circumstances of this case, Chief Bryant acted within his discretionary authority with respect to any act of defamation being attributed to him by Plaintiff. As for the malice standard,

> In the context of official immunity, actual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact. Actual malice does not include implied malice or the reckless disregard for the rights and safety of others. A deliberate intention to do wrong such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiff [ ].

(Campbell v. Goode, 695 S.E.2d 44, 45-46 (Ga. App. 2010). More, "Evidence demonstrating frustration, irritation, and possibly even anger is not sufficient to penetrate official immunity, nor is proof of ill will, unless the ill will is combined with the intent to do something wrongful or illegal." *Wilson v. Cromer*, Case No. A20A0844 (Ga. App. 2020).

There is no record evidence that Chief Bryant in any way intended to harm Ricardo Haro. He did not know or know of him. The Press Release was not Bryant's; it was the FBI's; the FBI was the author; the FBI and US Attorney determined the criminal criteria for offering cases to the US Attorney for prosecution; and the US Attorney made ultimate conclusions on just who and who not to prosecute. The

APDs sole job was to assist in evidence gathering for the FBI's development of its cases to present for federal prosecution. Bryant gave no input to the content of the press release; does not believe he saw the press release before the press conference began. And the speech given by Bryant was intended to be limited to an explanation of why Operation Phoenix was necessary to assist with the City's Summer of COVID crime spree. Summary judgment is proper.

**C. Assertion of Conditional Privilege**

O.C.G.A. § 51-5-7(1) provides for Georgia's public duty conditional privilege, affording protection for good faith statements made in the performance of a public duty. Plaintiff cannot argue that Chief Bryant's comments, if any, were not made in the good faith performance of a public duty. APD.SOP.1060, Exhibit "G" hereto, and Ex 2 to the Chata Spikes deposition, is the Department's Standard Operating Procedure ("SOP") covering Public Affairs. The approving authority for the SOP is the Chief of Police. The SOP, commanded by the Chief of Police, commands the dissemination of important information pertaining to APD to the public and media outlets, the Public Affairs Unit serving as a liaison between the APD and the public/media outlets. The informing of the public about the operation of a federal/state multi-agency taskforce certainly falls within the gambit of the public duty of a Chief of Police. (And there is no evidence Chief Bryant did anything in bad faith.)

O.C.G.A. § 51-5-7(7) affords immunity to those persons truthfully reporting information received from police authorities. To the extent the dissemination of any information pertaining to Plaintiff can be attributable to Chief Bryant, said information would have come directly to him from the police/law enforcement authorities of every member of Operation Phoenix. More, it was truthful that Plaintiff was being processed through Operation Phoenix at the behest of the FBI; it was truthful that he had been charged with simple battery upon a police officer; and excusing the double negative, there is no evidence at all that in the opinion of the FBI, the author of the press release, Plaintiff was not one of the most dangerous criminals in Atlanta.

**C. Which Liability Standard Applies?**

At the outset, this case involves a private Plaintiff, suing a public figure over speech of a public concern. The liability standards are high. Statutorily, one asserting a conditional privilege is free from liability unless the "privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted…." O.C.G.A. § 51-5-9. This is clearly an actual malice standard. And one would think it the logical standard by which to adjudicate this case.

But it appears that this case is more aptly reviewed through the lenses of what is assumed to be the more robust actual malice standard of *New York Times v.*

*Sullivan, supra*. Just last year our Supreme Court refused to require a private party plaintiff suing over a matter of private concern to prove *New York Times* levels of actual malice in order to succeed in her case. In doing so, more than once the Court utilized a situation almost fully on point with ours as a way of stating its conclusion there.

> In particular, the "actual malice" standard does not pertain to defamation cases brought by private-figure plaintiffs relating to statements that do not involve matters of public concern. Because the Court of Appeals incorrectly imported the "actual malice" standard into OCGA § 51-5-9 in this case, we vacate the Court of Appeals' opinion and remand the case to that court for further proceedings consistent with this opinion

*Oskouei v. Matthews*, 321 Ga. 1, 26 (2025). In fact, it twice made this comment without citation to case law. The United States Supreme Court has also held that even a private-figure plaintiff is required to prove *New York Times* "actual malice" in order to recover presumed or punitive damages if the defamatory statement was about a matter of public concern. Id. at 19; see Gertz, 418 U.S. 323, 349-350.

Thus, the presumption, at first, is that *New York Times* actual malice is in play here. Before going there though, let us first take a look at the statutory malice standard that the *Oskouei* Court replaced under the circumstances of that case. Just in case the Court does not read *Oskouei* as requiring *New York Times* malice in this case.

Properly raised, assertions of privilege are valid unless the "privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted…." O.C.G.A. § 51-5-9. *Oskouei's* requiring application of the federal constitutional standards in that case in 51-5-9's stead appears at face value to have been intended to provide greater power to those who have been wronged. Greater power than 51-5-9's private malice standard. If this understanding is correct then *New York Times* presumably creates a higher bar for proving liability than does 51-5-9. If so, logic should have it that a showing of *New York Times* actual malice would suffice to meet the lesser statutory standard. And Plaintiff can by no means meet even that lower standard, a standard soaked in subjective mire.

Critical to the analysis here, clear and convincing evidence of Bryant's subjective awareness of probable falsity is required, and mere failure to investigate does not evidence actionable reckless disregard.

> We may not presume knowledge of falsity or reckless disregard for the truth, and it cannot be "derived solely from the language of the publication itself. Reckless disregard requires clear and convincing proof that a defendant was aware of the likelihood he was circulating false information." (Punctuation omitted.) Sparks v. Peaster, 260 Ga.App. 232, 237-238(2), 581 S.E.2d 579 (2003). The evidence must focus not on what a reasonably prudent man would have done or whether a reasonably prudent man would have investigated further, *but instead must establish "in a clear and convincing manner that a defendant in fact entertained serious doubts as to the truth of his statements."* (Punctuation omitted.)

*Jones v. Albany Herald Pub. Co., Inc*., 290 Ga. App. 126, 132 (2008) (emphasis added).

"Actual malice" in a constitutional sense is not merely spite or ill will, or even outright hatred; it must constitute actual knowledge that a statement is false or a reckless disregard as to its truth or falsity. *Williams v. Trust Co*., 140 Ga.App. 49, 56 (1976). "Reckless disregard requires clear and convincing proof that a defendant was aware of the likelihood he was circulating false information. Thus, it is not sufficient to measure reckless disregard by what a reasonably prudent man would have done under similar circumstances nor whether a reasonably prudent man would have conducted further investigation. *The evidence must show in a clear and convincing manner that a defendant in fact entertained serious doubts as to the truth of his "statements."* *Atlanta Humane Society v. Mills*, 274 Ga. App. 159, __ (2005), quoting *Davis v. Shavers*, 225 Ga. App. 497, 500-501 (1997), aff'd, 269 Ga. 75 (1998).

Finally, to show actual malice by way of reckless disregard Haro must show Bryant had a subjective awareness of the press release's probable falsity. *Jones v. Albany Herald Publishing Co.,* 290 Ga. App. 126, 132 (2008). And failure to investigate does not show actionable reckless disregard. Id.

To close out, Chief Bryant again shows every box is checked in showing summary judgment is in order. For summary judgment purposes, overall, Plaintiff

will be unable to offer clear and convincing evidence that Chief Bryant in fact entertained serious doubts as to the truth of his statements or that he otherwise acted with *New York Times* actual malice.

Again, with respect to the press release, Bryant has shown undisputed evidence that it was an FBI press release (as determined by this Court in Haro I) authored by Operation Phoenix' lead FBI agent in charge, with no input or formal approval as to content, and which Brant was led to believe would not include the names of criminal suspects, only the number of operational successes.

And were the Court to assume Bryant's actions somehow transform him into an author or publisher of the press release, still there would be no evidence (let alone clear and convincing evidence) that Chief Bryant' subjective *mens rea* reached the level of actual malice required to impose liability. This also applies in full force to the press conference claims. At worst, the evidence may show negligence, may show a need to investigate (which it does not). But as the mountain of cited case law robustly indicates, such evidence is insufficient to show actual malice (again, let alone clear and convincing evidence thereof).

To the extent Haro's opposition brief may wax objectivity (though likely under the guise of purported subjectivity), that same mountain of case law stands in his way. Evidence of Bryant's subjective actions and subjective state of mind are

the focus of the legal inquiry before the Court. And it is evidence of those very things that show summary judgment on all claims is appropriate.

WHEREFORE, Defendant respectfully request this Court inquire into, and grant their Motion for Summary Judgment.

Respectfully submitted this 17th day of July, 2026.

**HALL BOOTH SMITH, P.C.**

*/s/ Phillip E. Friduss*
PHILLIP E. FRIDUSS
Georgia Bar No. 277220
*Counsel for Defendant Rodney Bryant*

191 Peachtree Street, N.E.
Suite 2900
Atlanta, GA 30303-1755
Tel: 404-954-5000
Fax: 404-954-5020
E-Mail: pfriduss@hallboothsmith.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| RICARDO HARO<br><br>Plaintiff,<br><br>v.<br><br>RODNEY BRYANT,<br><br>Defendant. | CIVIL ACTION FILE NO.<br>1:25-CV-00257-JPB<br><br>**JURY TRIAL DEMANDED** |

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served counsel for all parties who have appeared in this action a copy of the foregoing **BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** via e-filing a copy of the same by way of the Clerk of Court's e-filing system and which will automatically send an email notification of such filing to the following counsel of record as follows:

Nicole Jennings Wade
Jonathan D. Grunberg
G. Taylor Wilson
WADE, GRUNBERG & WILSON, LLC
3100 Cumberland Blvd., SE, Suite 1130
Atlanta, Georgia 30339
nwade@wgwlawfirm.com
jgrunberg@wgwlawfirm.com
twilson@wgwlawfirm.com
*Counsel for Plaintiff*

Respectfully submitted this 17th day of July, 2026.

**HALL BOOTH SMITH, P.C.**

*/s/ Phillip E. Friduss*
PHILLIP E. FRIDUSS
Georgia Bar No. 277220
*Counsel for Defendant Rodney Bryant*

191 Peachtree Street, N.E.
Suite 2900
Atlanta, GA 30303-1755
Tel: 404-954-5000
Fax: 404-954-5020
E-Mail: pfriduss@hallboothsmith.com