**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| RICARDO HARO<br><br>Plaintiff,<br><br>v.<br><br>RODNEY BRYANT,<br><br>Defendant. | CIVIL ACTION FILE NO.<br>1:25-CV-00257-JPB<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXIST NO GENUINE ISSUE FOR TRIAL**

COME NOW Rodney Bryant and City of Atlanta, Defendants in the above-captioned matter, by and through undersigned counsel, and file and serve this Statement of Material Facts in as to Which There Exists No Genuine Issue for Trial, hereby showing this Honorable Court as follows:

**1.**

On June 4, 2020, Plaintiff was arrested for a curfew violation and for spitting blood on the arm of an FBI agent. (Doc. 1, p. 7, ¶ 18).

**2.**

After the resignation of former Police Chief Erika Shields, The City asked Rodney Bryant to come out of retirement in order to serve as Interim Chief of Police. Chief Bryant accepted the appointment, effective June 12, 2020. (See generally,

Exhs E and F – respectively, select pages of and Deposition Transcript of Rodney Bryant (p. 11, Lines 18-20; p. 67 Lines 1-5).

**3.**

By June 4, 2020, COVID had all but shut down the City, and the processing of criminal matters through the state court system had screeched to a halt. (Bryant Aff., ¶ 3.

**4.**

As the City began to reopen during the Summer of 2020, there was a notable spike in crime. (Bryant Aff., ¶ 3; Ex. "B", Press Conference, https://www.youtube.com/watch?v=rUVZN_qEuAU, 9:20 – 10:50).

**5.**

In working through how to steer the City through the critical crime spike issue, an APD intelligence unit pieced together and presented to Chief Bryant and his Command Staff a network of individuals that they believed were truly committed to continuing violence and were having a significant impact on the crime being seen inside the City. (Bryant Affidavit, ¶ 4; Ex. B, Press Conference, https://www.youtube.com/watch?v=rUVZN_qEuAU, 9:20 – 10:50).

**6.**

Faced with these enormous, generational issues, Chief Bryant turned to the federal government and shared this information with it. (Bryant Affidavit, ¶ 5; Exhibit “B” Press Conference 10:50-11:30)

**7.**

Chief Bryant opened communications with the FBI, seeking help in stemming the City’s increase in violent crimes. (Id.)

**8.**

The federal government agreed and on August 18, 2020, Operation Phoenix was formalized. (Id.)

**9.**

Operation Phoenix was a multi-agency operation formed in order to identify, investigate, and prosecute violent individuals that could be charged with federal crimes, and be prosecuted through the federal justice system. (Bryant Affidavit, ¶ 6).

**10.**

Participating organizations included the FBI, Safe Streets Gang Task Force, Atlanta Police Department (“APD”), United States Attorney’s Office Northern District of Georgia (“USAO”), Georgia Bureau of Investigations, Homeland

Security Investigations, ATF, DEA, and the U.S. Secret Service. (Bryant Affidavit, ¶ 6).

**11.**

As the end game was federal prosecution for federal crimes, the FBI and US Attorney set the criteria for those individuals that would be prosecuted. (Bryant Affidavit, ¶ 7)

**12.**

On the ground, the operation was broken down into eight (8) teams made up of representatives from the various agencies. (Id.)

**13.**

These teams would process information on criminals and suspected criminals (both those on APDs original list and hundreds upon hundreds, if not thousands of others) and would forward information on to the FBI and USAO for prosecutorial decision-making. (Bryant Affidavit, ¶ 7).

**14.**

Information on Ricardo Haro was passed up the chain from Team 4. (Id.)

**15.**

APD Officer Dan Worrell was on Team 4. (Id.)

**16.**

Officer Worrell has no recollection whatsoever of how Ricardo Haro's name was discovered or processed. Exhibit "D" – Affidavit of Dan Worrell, ¶¶ 3-4).

**17.**

Worrell did not put Haro's name up for consideration for federal charges in connection with Operation Phoenix. (Worrell Affidavit, ¶ 4).

**18.**

Worrell never once spoke, wrote, or otherwise conversed with Rodney Bryant re Ricardo Haro, nor, to the best of memory, with any other Operation Phoenix participant. (Worrell Affidavit, ¶ 4).

**19.**

The FBI was the sponsoring agency seeking to have the US Attorney prosecute Plaintiff with some federal crime. (Bryant Affidavit, ¶ 7).

**20.**

As late as September 22, 2020, the US Attorney was still considering prosecuting Plaintiff on some form of federal charge/crime. (Bryant Affidavit, ¶ 7).

**21.**

Chief Bryant's participation in Operation Phoenix was limited to periodic conference calls. (Bryant Affidavit, ¶ 10).

**22.**

He personally made no recommendations of individual criminals/suspected criminals for investigative or prosecutorial consideration by the operation, had no input whatsoever in the criteria for selection for prosecution. (Bryant Affidavit, ¶ 10).

**23.**

Chief Bryant personally made no recommendations of individual criminals/suspected criminals for inclusion in Operation Phoenix. (Bryant Affidavit, ¶ 10).

**24.**

Chief Bryant had no knowledge of Plaintiff Ricardo Haro whatsoever, other than perhaps seeing that the FBI was the sponsoring agency for his consideration for prosecution by the US Attorney. (Bryant Affidavit, ¶ 10).

**25.**

Chief Bryant had no input into the content of the FBI's October 29, 2020 press release. (Bryant Affidavit, ¶¶ 10).

**26.**

Participation in the dissemination of information to the public pertaining to APD criminal investigations and other APD initiatives were within Chief Bryant's official duties, and within the scope of his authority. (Bryant Affidavit, ¶ 11).

**27.**

But Chief Bryant had nothing to do with the FBI's October 29, 2020 press release. (Bryant Aff., ¶ 11).

**28.**

Chief Bryant was not asked for input into the release, nor did he provide any information or oversight review regarding same. (Id.)

**29.**

The FBI's October 29, 2020 press release was not the APD's press release. (Id.)

**30.**

Had it been APD's press release, the content of same would have been required to go through APD processes and policies for the issuance of such releases. (APD's SOP 1060.4.6.1 would have required the Department's Public Affairs Unit to prepare the press release for distribution to the media). (Id.)

**31.**

The City of Atlanta/Rodney Bryant at no time published or released the FBI's October 29, 2020 press release. (Id.)

**32.**

The FBI posted its press release on its website. (Ex A).

**33.**

Chief Bryant did not participate in the crafting or approval process of the release, and as mentioned played no role in the selection of who the federal government would choose to prosecute or include in the release. (Bryant Affidavit, ¶ 11).

**34.**

Bryant was contacted by FBI AIC Hacker about the release before it was made public. (Bryant Depo., p. 73, lines 12-18).

**35.**

Bryant did not review the content of the press release at that time. (Bryant Depo., p. 73, lines 12-18).

**36.**

From his discussion with FBI AIC Hacker regarding the press release and conference, Chief Bryant was made to understand that individual names were not going to be released, only the number of successes enjoyed by the operation. (Bryant Depo., p. 73, lines 19-25 through p. 74, lines 1-2).

**37.**

The FBI called for the October 29, 2020 press conference. It was the FBI's press conference, hosted by the City. It was hosted by the City merely as a matter of convenience. (Bryant Affidavit, ¶ 13).

**38.**

For the press conference, the FBI specifically asked Chief Bryant to speak to the why's and how's of Operation Phoenix' genesis. (Bryant Affidavit, ¶ 14).

**39.**

He did so, speaking to the complexities of the rise in violent crimes, and the effects of re-opening a COVID-ravaged City almost contemporaneously with a period of civil unrest unlike any other - before the formation of Operation Phoenix. (Id.).

**40.**

Bryant spoke specifically about the APD investigative unit that produced data to him and his command staff about an interconnected network of individuals committed to continuing violence and significantly impacting the City's crime rate – before the formation of Operation Phoenix. (Id.).

**41.**

At the press conference Bryant advised that the vast network of individuals shown by his investigative unit served as the impetus for his reaching out to the federal government for federal assistance. (Id.)

**42.**

Bryant spoke to the federal partnerships he formed in helping found Operation Phoenix**.**

**43.**

The lead speakers at the Presser were FBI Special Agent in Charge Chris Hacker, former United States Attorney BJay Pak, and Chief Bryant. Hacker went first, Pak second, and then Bryant. While they others spoke to results, Bryant spoke to how and why Operation Pheonix came into existence in the first place (Id); (Exhibit B throughout).

**44.**

In relevant part, Chief Bryant then gave a brief speech covering the history and actions of the APD during the time of crisis, and before Operation Phoenix had even been contemplated.

> How did we get here? We began to see crime beginning to increase in May of this year, which coincided with the opening of the City as it relate[d] to people suffering from the stresses of COVID 19. And as those numbers began to spike, as we entered upon civil unrest we saw the greatest numbers of homicides in our City. We had more homicides in the month of July than we had had in most previous years.
>
> …[A]s my team and I got together to work to come up with ideas and solutions to figure out how do we resolve it, and why this…was occurring, there was a resilient group of men and women in our intelligence unit who provided the resources to continue to protect the men and women of this City. And so, as they brought me down to give How did we get here? We began to see crime beginning to increase in May of this year, which coincided with the opening of the City as it

> relate[d] to people suffering from the stresses of COVID 19. And as those numbers began to spike, as we entered upon civil unrest we saw the greatest numbers of homicides in our City. We had more homicides in the month of July than we had had in most previous years.
>
> …[A]s my team and I got together to work to come up with ideas and solutions to figure out how do we resolve it, and why this…was occurring, there was a resilient group of men and women in our intelligence unit who provided the resources to continue to protect the men and women of this City. And so, as they brought me down to give me some ideas of what we were seeing as it relates to violent crime, they showed me a network of individuals that they believed were truly committed to continuing violence and thought that they were having a significant impact on the crime that we were seeing inside the City.
>
> Immediately looking at this work, this vast work that they had delivered to the Command Staff, I recognized that we needed to bring in partnerships and so immediately I called Chris Hacker over at the FBI who I worked with prior to my retirement and always had a strong partnership with and asked for his assistance. And immediately we developed an idea to broaden the perspective of partnership and we thought that this would really have a significant impact on what we were trying to accomplish.
>
> . . . .
>
> And so immediately after we developed [Operation Phoenix], the numbers started to stave off as we started to make arrests of some of these individuals. There's no specific area in th[e] City of Atlanta that these individuals did not touch. There was no specific crime other than their violence that they did not touch. There was no level of crime that they did not have an impact on. This included gang affiliation, drug sales, and violent crimes alike. (Exhibit "B" - (Press Conference 9:20-11:22; 11:39-12:09).

**45.**

Chief Bryant continued his comments by noting that the network of individuals the City brought to the attention of the federal government were involved

in gun crimes and gang-related activities, were repeat violent offenders, and that there was some nexus between them, going into some detail describing that nexus. (Exhibit "B" – Press Conference -12:09-13:35);

**46.**

He then spoke to the positive effects of Operation Phoenix and emphasized that the focus was to bring individuals earmarked by the Operation in on federal charges due to the stalemate of the state court system. (Exhibit "B" – Press Conference -12:09-13:35).

**47.**

Operation Phoenix processed hundreds upon hundreds, if not thousands upon thousands of names beyond the network of individuals originally identified by APD intelligence unit. (Bryant Aff., ¶ 15).

48.

There is no evidence that Plaintiff was included in the network of individuals the City shared with the federal government. (The Record)

49.

The APD's Standard Operating Procedure ("SOP") governing public affairs is 1060. (Exhibit "J" – APD SOP 1060).

50.

The approving authority for the SOP is the Chief of Police. (Id.)

51.

The SOP, commanded/approved by the Chief of Police, commands the dissemination of important information pertaining to APD to the public and media outlets, the Public Affairs Unit serving as a liaison between the APD and the public/media outlets. (ADP.SOP 1060).

52.

Any and all APD press releases are prepared and disseminated by the Public Affairs Unit. (APD.SOP.1060.4.6.1).

53.

The Public Affairs Unit, nor any other City agency prepared or published the FBI's press release. (Spikes Affidavit, Ex I, ¶ 3; Bryant Affidavit, ¶ 11).

54.

Chief Bryant did not mention Plaintiff during the press conference, nor did he intimate Plaintiff was one of those wreaking havoc upon the City. (The Record).

55.

Nor did Chief Bryant mention the press release at the press conference. (The Record).

**56.**

There is no evidence the press release was made available at the press conference. (The Record).)

**57.**

There is no evidence Chief Bryant knew or thought that the press release was going to be disseminated at the press conference. (The Record).

**58.**

The subject of Chief Bryant's speech was limited to the genesis of Operation Phoenix. (Bryant Aff., p.8, ¶ 14).

**59.**

The subjective intent behind Chief Bryant's speech at the press conference was to address the genesis of Operation Phoenix. (Bryant Aff., p.8, ¶ 14).

**60.**

Bryant subjectively believed he was addressing the genesis of Operation Phoenix when speaking at the press conference.

**61.**

There is no evidence that Chief Bryant intended to harm Haro in any way though his speech at the press conference. (The Record).

**62.**

At no time during his speech at the press conference did Chief Bryant intend to address the List of 12 – the list of the 12 most dangerous criminals in Atlanta. (Bryant Aff., p.8, ¶ 14).

**63.**

Instead, when referring to a network of criminal individuals, he was speaking about the network originally identified by an APD investigative team prior to the formation of Operation Phoenix. (Id.)

WHEREFORE, Defendant respectfully requests this Court inquire into, and grant his Motion for Summary Judgment.

Respectfully submitted this 17th day of July, 2026.

**HALL BOOTH SMITH, P.C.**

*/s/ Phillip E. Friduss*
PHILLIP E. FRIDUSS
Georgia Bar No. 277220
*Counsel for Defendant Rodney Bryant*

191 Peachtree Street, N.E.
Suite 2900
Atlanta, GA 30303-1755
Tel: 404-954-5000
Fax: 404-954-5020
E-Mail: pfriduss@hallboothsmith.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| RICARDO HARO<br><br>Plaintiff,<br><br>v.<br><br>RODNEY BRYANT,<br><br>Defendant. | CIVIL ACTION FILE NO.<br>1:25-CV-00257-JPB<br><br>**JURY TRIAL DEMANDED** |

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served a copy of the within and foregoing **DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXIST NO GENUINE ISSUE FOR TRIAL** upon all parties to this matter by electronically filing the same with the Clerk of Court through the electronic E-file system, which will automatically send an e-mail notification of such filing to the following attorneys of record as follows:

Nicole Jennings Wade
Jonathan D. Grunberg
G. Taylor Wilson
WADE, GRUNBERG & WILSON, LLC
3100 Cumberland Blvd., SE, Suite 1130
Atlanta, Georgia 30339
nwade@wgwlawfirm.com
jgrunberg@wgwlawfirm.com
twilson@wgwlawfirm.com
*Counsel for Plaintiff*

Respectfully submitted this 17th day of July, 2026.

**HALL BOOTH SMITH, P.C.**

*/s/ Phillip E. Friduss*
PHILLIP E. FRIDUSS
Georgia Bar No. 277220
*Counsel for Defendant Rodney Bryant*

191 Peachtree Street, N.E.
Suite 2900
Atlanta, GA 30303-1755
Tel: 404-954-5000
Fax: 404-954-5020
E-Mail: pfriduss@hallboothsmith.com